J. S47031/17

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

IN THE INTEREST OF:                 :    IN THE SUPERIOR COURT OF
A.M.P., A MINOR                     :          PENNSYLVANIA
                                    :
APPEAL OF:  P.H., FATHER            :    No. 2759 EDA 2016


Appeal from the Decree, August 4, 2016,
in the Court of Common Pleas of Philadelphia County
Family Court Division at Nos. CP-51-AP-0000648-2016,
FID: 51-FN-002688-2012


BEFORE:  LAZARUS, J., MOULTON, J., AND FORD ELLIOTT, P.J.E.


MEMORANDUM BY FORD ELLIOTT, P.J.E.:            **FILED OCTOBER 06, 2017**

P.H. ("Father") appeals from the decree dated and entered August 4, 2016,[1] in the Court of Common Pleas of Philadelphia County, granting the petition of the Philadelphia County Department of Human Services ("DHS") and involuntarily terminating his parental rights to his minor, dependent child, A.M.P. (the "Child"), a female born in May of 2008, pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[2]  After review, we affirm.

---

[1] While review of the record, including the trial court docket, indicates that the decree was dated and entered August 4, 2016, the trial court docket appears to incorrectly reflect that the decree was filed on August 1, 2016.

[2] By separate decrees entered the same date, the trial court additionally involuntarily terminated the parental rights of Child's mother, E.A.P. ("Mother"), as well as Unknown Father.  An appeal has not been filed by either Mother or any unknown father, nor is Mother or any unknown father a party to the instant appeal.

The trial court summarized the relevant procedural and/or factual history, in part, as follows:

> On November 30, 2011, the Department of Human Services (DHS) received a General Protective Services (GPS) report alleging that A.M.P.'s Mother contacted A.M.P.'s school requesting A.M.P. be placed on [the] school bus to be transported home because she was feeling ill. Mother was advised A.M.P. was not on the bus transportation list and could not be transported home. Mother arrived to retrieve A.M.P. from school and appeared to be intoxicated. The report alleged Mother slurred her words, and was unable to walk in a straight line, smelled of alcohol and wore sunglasses. The report alleged Mother contacted her therapist, and that her therapist went to the school to retrieve Mother and A.M.P. The report further alleged that Mother was diagnosed as suffering from depression and was prescribed medication. A.M.P. suffered from Attention Deficit Hyperactivity Disorder ([A]DHD) and required close supervision. The report was substantiated.
>
> On October 4, 2012, DHS received a GPS report alleging that 15th District Philadelphia Police officers responded to a call alleging that Mother was intoxicated and bleeding from her head. The report alleged that Mother told police officers she fell. Mother was observed hitting her head against the window of her apartment. A.M.P. was crying and appeared to be extremely upset. Mother was unable to provide information for any family resources to care for A.M.P. because she was very intoxicated and incoherent. The report further alleged that Mother was transported to Frankford Hospital. A.M.P.'s stepfather went to Frankford Hospital and provided the staff with his telephone number and the telephone number of A.M.P.'s maternal grandmother. Both numbers were called and there was no answer. This report was substantiated.

On October 4, 2012, Philadelphia Police officers transported A.M.P. to DHS. DHS located the name and telephone number of A.M.P.['s] paternal grandmother and Father. DHS attempted to contact both parties, however no one answered the calls. DHS left a voicemail message for paternal grandmother and requested she contact DHS. DHS was unable to leave a voicemail message for Father because his voicemail was not activated. There were no family or friends available to care for A.M.P.

On October 4, 2012, DHS obtained an Order of Protective Custody (OPC) for A.M.P. and placed her at Youth Services, Inc. (YSI) Baring House Crisis Nursery.

At the Shelter Care Hearing held for A.M.P. on October 5, 2012, the OPC was lifted and the temporary commitment to DHS was ordered to stand.

On October 15, 2012, an Adjudicatory Hearing for A.M.P. was held before the Honorable Thomas M. Nocella, who adjudicated A.M.P. dependent and committed her to DHS. Judge Nocella ordered that Mother comply with all recommendations for mental health treatment. Mother was referred to the Clinical Evaluation Unit (CEU) for a dual diagnosis assessment and forthwith drug screen. Mother [was] referred to the Behavioral Health System (BHS) for monitoring.

On November 14, 2012[,] by administrative order, the DHS commitment was discharged and DHS was ordered to supervise A.M.P. residing with her Father.

. . . .

On March 14, 2013, Mother was arrested and charged with possessing an instrument of a crime with the intent to employ it criminally, terroristic threats with the intent to terrorize another, simple assault, recklessly endangering another person, and harassment. Mother had allegedly attempted to stab

Father. Father posted partial bail for Mother on April 13, 2013.

On May 7, 2013, a termination of court of supervision [h]earing was held before the Honorable Allan L. Tereshko, who found A.M.P. was not a dependent child, and discharged DHS supervision and the dependent petition. A.M.P. continued to reside with Father. At the time, Mother was reportedly incarcerated at Riverside Correctional Facility (RCF). IHPS continued to be provided in the home of Father.

On June 20, 2013, Mother pled guilty to possessi[on] of an instrument of crime with intent to employ it criminally and terroristic threats with intent to terrorize another. The remaining charges were withdrawn[.] Mother was sentenced to 12 months of reporting probation.

On or about July 20, 2013[,] Mother was released from incarceration and returned to living with A.M.P., [] Father and A.M.P.'s paternal half-sibling.

On August 30, 2013, DHS visited the family's home. Father and Mother both requested that the Safety Plan be modified to allow Mother unsupervised visitation with the children. DHS explained to Father and Mother that the Safety Plan could not be changed until DHS received confirmation f[ro]m Northeast Treatment Center ([N]ET) that Mother was attending drug and alcohol treatment.

On September 11, 2013, DHS learned that Father and Mother were involved []in a heated argument in front of A.M.P. and A.M.P.'s sibling. DHS learned that the IHPS worker remained in the home because the IH[]PS worker was concerned for the safety of the children. Father eventually took A.M.P. and A.M.P.'s sibling to a friend's home for the night.

On September 24, 2013, DHS filed an urgent petition for A.M.P.

On October 9, 2013, an Adjudicatory Hearing for A.M.P. was held before Judge Tereshko, who found that A.M.P. [was] residing with Father in the home of A.M.P.'s paternal grandmother and deferred dependent adjudication. Judge Tereshko granted Mother twice weekly supervised visits with A.M.P. at DHS. Judge Tereshko ordered Mother to be referred to the CEU for a drug screen, dual diagnosis assessment and monitoring. Judge Tereshko found it was not contrary to A.M.P.'s health, safety, and welfare for her to remain in Father's care.

On October 16, 2013, DHS received allegation[s that] Father had been angry with A.M.P. and grabbed her right arm, causing bruising to A.M.P.'s right arm. A.M.P. complained of pain in her arm. A.M.P. stated she was afraid of her Father and was afraid to return to his home. The report alleged that Father grabbed A.M.P. by the hair and slapped her face. A.M.P. attended Marshall Elementary School and suffered from autism. Father was not seeking services to assist A.M.P. with her autism. Mother had a history of mental health and drug and alcohol issues. Mother and Father had a history of domestic violence. Father had difficulty managing his anger. It was alleged that A.M.P. was residing with Father because of Mother's history of mental illness. Mother was not seeking treatment and Father resided with A.M.P.['s] paternal grandmother.

On October 16, 2013, DHS obtained an OPC for A.M.P. and placed her in an Asociacion De Puertorriquenos En Marcha (APM) foster home.

At the Shelter Care Hearing for A.M.P. held on October 18, 2013, the OPC was lifted and the temporary commitment to DHS was ordered to stand. Father was granted supervised visits at A.M.P.'s discretion. A.M.P. was referred to BHS for a consultation and an evaluation. DHS was ordered to explore kinship resources for A.M.P. The Court ordered that if A.M.P. returned to the care of her parent(s), IHPS be reinstated by agreement of the parties.

On January 8, 2014, an Adjudicatory Hearing for A.M.P. was held before Judge Allan Tereshko, who discharged the temporary commitment to DHS, adjudicated A.M.P. dependent and committed A.M[.]P. to DHS. Judge Tereshko ordered that Mother be referred to ARC and to the CEU for a drug screen, a dual diagnosis assessment, and monitoring. Mother was granted liberal supervised visits with A.M.P. in the community. Father's visits were suspended.

On April 23, 2014[,] a Permanency Review hearing was held for A.M.P. before Judge Allan Tereshko[,] who ordered A.M.P.'s commitment to DHS discharged and she be reunified with Mother.

DHS supervise[d] A.M.P.'s care. The Court further ordered that Mother continue to attend drug and alcohol and mental health treatment.

On June 6, 2014, DHS received [a] GPS report alleging A.M.P. contacted emergency services [the] morning of June 6, 2014 and reported her Mother was incapacitated. An Emergency Medical Services (EMS) team arrived at the family's home and transported Mother to Frankford Hospital where she was found to be highly intoxicated and in an agitated state of mind.

Frankford Hospital was treating and performing additional screens for Mother. The report further alleged that[,] subsequent to contacting emergency services, A.M.P. went to school. A.M.P. suffered from autism. A.M.P. was reunified with Mother. The report was substantiated.

On June 6, 2014, DHS visited John Marshall Elementary School and met with A.M.P. and A.M.P.'s teacher, who stated that Mother had been exhibiting bizarre behavior since June 3, 2014. It appeared that A.M.P. had been caring for herself for quite some time. A.M.P. stated that her Mother had been sick and that she had been unable to wake her

that morning. It was reported when the ambulance arrived at Mother's home, she was unconscious. The emergency medical technician (EMT) was able to revive Mother.

On June 6, 2014, DHS obtained an OPC for A.M.P. and placed her in a foster home through Turning Points for Children.

At the Shelter Care Hearing for A.M.P. held on June 9, 2014, the OPC was lifted, the temporary commitment to DHS was discharged, and A.M.P. was recommitted to DHS. The Court ordered Mother to be offered twice weekly visits with A.M.P. and [] referred to the CEU for a drug and alcohol screen, a dual diagnosis assessment and monitoring.

At that time, DHS was informed Father was not involved in A.M.P.'s care.

On September 23, 2014, a Permanency Review Hearing for A.M.P. was held before the Honorable Vincent L. Johnson[,] who ordered that A.M.P. remain committed to DHS. Judge Johnson ordered that A.M.P. be referred to the Center for Autism. Father was referred to the CEU for monitoring and full drug and alcohol assessment[.] Father was ordered to attend anger management counseling, domestic violence counseling and parenting education classes. Father was referred for a parenting capacity evaluation.

. . . .

On April 21, 2016[,] a Permanency Review Hearing for A.M.P. was held before the Honorable Lyris F. Younge, who ordered that she remain as committed to DHS. The Court found that A.M.P. was doing well. A.M.P.['s] concurrent permanency goal was adoption. The Court stated Father had exhibited no compliance with the permanency plan. Father was non-compliant with the recommendation of the parenting capacity evaluation and was not visiting A.M.P. consistently. The Court ordered Father was

> to be prohibited from visiting A.M.P. until further
> order of the Court.

Trial court opinion, 3/27/17 at 1-5.

On July 20, 2016, DHS filed a petition to involuntarily terminate the parental rights Child's parents. Thereafter, the trial court conducted a combined termination and goal change hearing on August 4, 2016. In support of its petitions, DHS presented the testimony of CUA case managers, Kimberly Keene and Shalisa Smith, from Turning Points for Children. Father and Mother, both represented by counsel, testified on their own behalf.

By decree dated and entered August 4, 2016, the trial court involuntarily terminated Father's parental rights to Child.[3] On August 30, 2016, Father filed a timely notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Father raises the following issues for our review:

1. Whether the Trial Court erred in Terminating [Father]'s Parental Rights under 23 Pa.C.S.A. section 2511(a)(1), the evidence having been insufficient to establish Father had evidenced a settled purpose of relinquishing parental claim,

---

[3] The trial court announced its decision, memorialized by subsequent decree, on the record on August 4, 2016. (Notes of testimony, 8/4/16 at 89.) In so doing, the court additionally noted a goal change to adoption. (*Id.*) Although we cannot confirm whether the goal change was reflected by order, as the dependency record was not included with the certified record, as Father does not appeal a goal change, any such claims related thereto are not preserved. Pa.R.A.P. 903(a) (a notice of appeal shall be filed within 30 days after entry of the order from which the appeal is taken).

> or having refused or failed to perform parental duties[?]
>
> 2. Whether the Trial Court erred in Terminating [Father]'s Parental Rights under 23 Pa.C.S.A. sections 2511(a)(2), (a)(5), and (a)(8), the evidence having been not sufficient to establish that [Father] had refused or failed to perform parental duties, caused children to be without essential parental care, that conditions having led to placement had continued to exist, or that any of [the] above could not have been remedied[?]

Father's brief at 5.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, 9 A.3d [1179, 1190 (Pa. 2010)].

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence."

*In re M.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*), quoting

*Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998). In this case, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8), as well as (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc)*. Here, we analyze the court's termination decree pursuant to Subsections 2511(a)(2) and (b), which provide as follows:

### § 2511. Grounds for involuntary termination

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . . .

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of

> environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015), quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002).

Instantly, in finding grounds for termination pursuant to Section 2511(a)(2), the trial court concluded that DHS presented clear and convincing evidence. (Trial court opinion, 3/27/16 at 7.)

Father, however, argues that the evidence does not support any deficit in his capacity to parent Child. (Father's brief at 13.) Father highlights his completion of a CEU drug screen, parenting classes, and anger management. (*Id.*) Father, likewise, maintains as instructive that three children are in his care. (*Id.*) We disagree.

A review of the record supports the trial court's determination of a basis for termination under Section 2511(a)(2). The evidence establishes that Father failed to complete his established SCP objectives. Former CUA case manager, Kimberly Keene, recounted Father's objectives as including parenting classes, anger management, domestic violence counseling, a forthwith CEU screen, and a parenting capacity evaluation. (Notes of testimony, 8/4/16 at 25.) While Ms. Keene indicated that Father completed parenting classes, anger management, and a CEU screen from 2014, she reported that he never completed a parenting capacity evaluation. (*Id.* at 25.) Ms. Keene testified that Father "became involved for a brief period" during her participation in the case. (*Id.* at 24.) She explained, "[Father] became involved like late 2014 and he was going to court hearings and, you know, he was following his court orders. But it was like early 2015,

for some reason he just -- you know. [A]ll communication just ceased ever since." (***Id.*** at 24-25.)

Similarly, the current CUA case manager at the time of the hearing, Shalisa Smith, testified to a lack of proof regarding completion of domestic violence counseling, through Menergy as court ordered, as well as the parenting capacity evaluation.[4, 5] (***Id.*** at 54.) Ms. Smith further indicated no contact from Father until June of 2016, despite monthly letters, when he called to determine what he would need to do to re-engage. (***Id.*** at 54-55.) Father came to the CUA office on June 27, 2016; however, there has been no subsequent contact. (***Id.***) Critically, beyond acknowledgement of failure to complete his SCP objectives, Ms. Smith additionally expressed concerns about Child's safety if returned to Father's care due to lack of completion of his SCP objectives. (***Id.*** at 56.)

As this court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." ***In re Adoption of R.J.S.***, 901 A.2d 502, 513 (Pa.Super. 2006). Hence, the record substantiates the conclusion

---

[4] Ms. Smith acknowledged that Father's SCP objectives had not changed since her involvement in the case. (Notes of testimony, 8/4/16 at 53.)

[5] Ms. Smith indicated that her agency referred Father "multiple times" for a parenting capacity evaluation. (Notes of testimony, 8/4/16 at 54.)

that Father's repeated and continued incapacity, abuse, neglect, or refusal has caused Child to be without essential parental control or subsistence necessary for her physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d at 1272. Moreover, Father cannot or will not remedy this situation. *See id.* As noted above, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a) before assessing the determination under Section 2511(b), and we, therefore, need not address any further subsections of Section 2511(a). *In re B.L.W.*, 843 A.2d at 384.

We next determine whether termination was proper under Section 2511(b). Our supreme court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012). In *In re E.M.*, 620 A.2d [481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond

exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "[T]he court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010) (internal citations omitted).

Moreover,

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d at 1219, quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011) (quotation marks and citations omitted).

Our supreme court has stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, *supra* at 268. The court directed that, in weighing the

bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* court observed that "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

In determining that termination of Father's parental rights favored Child's needs and welfare, the court reasoned, "In the instant matter, the testimony of the social worker stated A.M.P.'s day to day needs were being met by her foster parent. Furthermore, social worker testified that A.M.P. would not suffer any irreparable emotional harm if Father's parental rights were terminated." (Trial court opinion, 3/27/17 at 7 (citations to record omitted).)

Father, however, failed to preserve a challenge related to Subsection (b) by failing to raise the issue in both his concise statement of errors complained of on appeal and the statement of questions involved section of his brief, and by failing to present argument related thereto in his brief. As such, we find that Father has waived such claims. *See Krebs v. United Refining Co. of Pennsylvania*, 893 A.2d 776, 797 (Pa.Super. 2006) (stating that a failure to preserve issues by raising them both in the concise statement of errors complained of on appeal and statement of questions involved portion of the brief on appeal results in a waiver of those

issues); *In re W.H.*, 25 A.3d 330, 339 n.3 (Pa.Super. 2011), *appeal denied*, 24 A.3d 364 (Pa. 2011), quoting *In re A.C.*, 991 A.2d 884, 897 (Pa.Super. 2010) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived."). *See also In re M.Z.T.M.W.*, 2017 WL 2153892 (Pa.Super. 2017) (holding that the appellant waived her challenge to Section 2511(b) by failing to include it in her concise statement and statement of question involved). Nevertheless, in light of the bifurcated analysis, we review Subsection (b) below and determine that, had Father preserved this issue, we would have found it lacked merit.

Upon review, the record supports the trial court's finding that Child's developmental, physical, and emotional needs and welfare favor termination of Father's parental rights pursuant to Section 2511(b). There was sufficient evidence to allow the trial court to make a determination of Child's needs and welfare, and as to the existence of a bond between Father and Child that, if severed, would not have a detrimental impact on her.

While Father testified to approximately five phone calls with Child during Child's visitation with Mother (notes of testimony, 8/4/16 at 65-66, 68), and current CUA case manager, Shalisa Smith, stated that Child occasionally asks about Father (*id.* at 56), Father has not had consistent

visitation with Child since early 2015.[6]  (*Id.* at 25.)  In fact, in noting no visits since her involvement in the case, Ms. Smith observed that the most recent court order did not allow for visitation between Father and Child.  (*Id.* at 55.)  Further, Ms. Smith expressed safety concerns should Child be returned to Father's care.  (*Id.* at 56.)

Moreover, and more importantly, Child is in a pre-adoptive foster home where she is doing well.  (*Id.* at 49, 53.)  Foster parent has been Child's consistent caregiver, and Child looks to her foster parent to meet her daily needs.  (*Id.* at 53, 58.)  When asked to describe Child's interaction with and response to her foster parent, Ms. Smith testified, "It's positive. She's happy.  She enjoys being in the home.  She has other girls in the home that she hangs out with so to speak and they get along well."  (*Id.* at 53.)  As such, Ms. Smith expressed that Child would not experience "harm beyond repair" if Father's parental rights were terminated.  (*Id.* at 56.)  She further opined that it would be in Child's best interests to be freed for adoption.  (*Id.*)

Thus, as confirmed by the record, termination of Father's parental rights serves Child's developmental, physical, and emotional needs and welfare.  While Father may profess to love Child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental

---

[6] Father testified that he has twins who were in and out of the hospital and he "lost contact."  (Notes of testimony, 8/4/16 at 67-68.)

rights. *In re Z.P.*, 994 A.2d at 1121. As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id.* at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa.Super. 2004) (citation omitted).

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Father's parental rights under 23 Pa.C.S.A. § 2511(a)(2) and (b).

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/6/2017